UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-CV-10103-GAO

| | |
|---|---|
| LANCE HULLUM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL MALONEY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants submit this memorandum of law, along with their Concise Statement of Material Facts submitted herewith, in support of their Motion for Summary Judgment.

**INTRODUCTION**

The above-captioned litigation was initially filed *pro se* by plaintiff Lance Hullum, an inmate lawfully incarcerated with the Department of Correction. On or about May 17, 2004, a notice of appearance by counsel, Dana Johnson, was filed. The original Complaint, filed by plaintiff Hullum in this case has not been amended, and thus, still stands. Plaintiff is an inmate lawfully incarcerated within the DOC and is currently and at all times relevant to his Complaint was housed at the Massachusetts Correctional Institution, at Cedar Junction, ("MCI-Cedar Junction"), a maximum security facility located in Walpole, Massachusetts. Plaintiff's complaint seeks monetary relief for what appears to be claims of the following (1) improper housing in the Special Management Unit("SMU"), 10-Block, at MCI-Cedar Junction; (2) deliberate indifference to his medical needs; and (3) retaliation. Although somewhat confusing, it appears that plaintiff is attempting to make a claim of a loss of liberty in violation of the due process clause of

the federal Constitution and an Eighth Amendment claim of cruel and unusual punishment based upon a deliberate indifference to a serious medical need. Plaintiff has named the following defendants: Michael Maloney, then Commissioner of the Department of Correction; Kathleen Dennehy, present Commissioner of the Department; Peter Allen, then Superintendent, MCI-Cedar Junction; John Luongo, Jr., Deputy Superintendent, MCI-Cedar Junction; Steven Silva, then Deputy Superintendent, MCI-Cedar Junction; and Edwin Doolin, then Captain, MCI-Cedar Junction.

Defendants are entitled to judgment as a matter of law on all counts of the Complaint. Accordingly, defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## ARGUMENT

I. **STANDARD OF REVIEW**

Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A non-moving party cannot rest on mere allegations; the non-moving party must adduce specific, provable facts that establish that there is a triable issue. Rogers v. Fair, 902 F.2d 130, 143 (1st Cir. 1990). "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex, 477 U.S. at 317 (quoting Fed. R. Civ. P. 56(c)). In addition, there must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

For the following reasons, summary judgment should enter for the defendants.

II. **PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES PURSUANT TO THE PRISON LITIGATION REFORM ACT.**

Although defendants concede that plaintiff did, in fact, exhaust his administrative remedies with regard to the claims identified above, *to wit*, a due process claim regarding his housing in 10-block, an Eighth Amendment claim regarding his medical needs and his retaliation claim,[1] plaintiff's Complaint could be interpreted to make other claims if read extremely liberally. As such, no further claims may be pursued here, as plaintiff has not exhausted his administrative remedies regarding any further claims. For example, the Complaint, if read extremely liberally, could be interpreted to make a claim regarding plaintiff's conditions of confinement in 10-block.[2] Because plaintiff did not exhaust administrative remedies with regard to this issue, it cannot be pursued here.

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part:

[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

---

[1] See grievances, attached hereto at Exhibits A1, A2, and A3.
[2] Defendants further assert that compliance with the rules of civil procedure is particularly critical at the pleading stage because "appropriate defense motions and answers are not possible in the absence of a complaint that . . . sets forth plainly, concisely and directly the plaintiff's claims." Moe v. Commonwealth, 393 Mass. 617, 620 (1985). Pursuant to Mass.R.Civ.P. 8(a), "[a] pleading which sets forth a claim for relief, whether an original claim, . . . , shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Thus, this Court should not, in the first instance, permit a reading of plaintiff's Complaint that includes any further claims than those identified by defendants. However, in the circumstance that this Court does accept further claims, these fail as plaintiff failed to exhaust.

42 U.S.C. § 1997e(a)(1996).  The Courts have recognized that "Congress promulgated the PLRA to curtail prisoner tort, civil rights and conditions of litigation" with its main objective being "to curtail abusive prison condition litigation." <u>Anderson v. Singletary</u>, 111 F.3d. 801, 805 (11th Cir. 1997) *quoting* <u>United States v. Simmonds</u>, 111 F.3d. 737, 743 (10th Cir. 1997).  Specifically, "Congress enacted the PLRA primarily to curtail claims brought by prisoners under 42 USC §1983 and the Federal Tort Claims Act, most of which concern prison conditions and many of which are routinely dismissed as legally frivolous.  The text of the PLRA reflects this focus." <u>Anderson</u>, *supra*, *quoting* <u>Reyes v. Keane</u>, 90 F.3d. 676, 678 (2nd Cir. 1996).

Moreover, cases involving allegations of physical violence by prison guards are not exempt from this rule.  <u>Casanova v. DuBois</u>, 289 F.3d 142,147 (2002), *citing* <u>Porter v. Nussle</u>, 122 S.Ct. 983, 992 (2002) (holding that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"). The PLRA mandates complete administrative review of all claims before an inmate may bring a §1983 action.  <u>Brown v. Toombs</u>, 139 F.3d 1102, 1104 (6th Cir. 1998) (plaintiffs must allege and show that they have exhausted all available state administrative remedies and the district courts should enforce exhaustion requirement *sua sponte* if not raised by defendant).

As the court stated in <u>Beatty v. Goord</u>:

[t]here are a number of important reasons which support exhaustion of administrative remedies.  First, an exhaustion requirement better serves the policy of granting an agency the opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.  Second, an exhaustion requirement better avoids the possibility that frequent and deliberate flouting of prison administrative

> processes could weaken the effectiveness of those prisons by encouraging people to ignore their procedures. Third, an exhaustion requirement promotes judicial efficiency. Fourth, even if no relief is granted, a prisoner's resort to the administrative process is not futile, but allows grievances to be heard and a record to be created for review in any subsequent proceeding.

2000 WL 288358 1, 3 (S.D.N.Y. 2000) (citations omitted) (dismissing plaintiff's complaint for failure to exhaust available administrative remedies pursuant to the PLRA).

In the instant case, formal grievance procedures were available to plaintiff as set forth in 103 DOC 491.00 *et seq.* Plaintiff makes no allegations with regard to exhaustion; however, defendants received three (3) grievances regarding the subject matter of this Complaint. First, plaintiff grieved the issue of retaliation in grievance #1619 in which he claims that a disciplinary report was issued in retaliation for his asserting his first amendment right to complain about officers within MCI-Cedar Junction. *See* Exhibit A1. Similarly, plaintiff grieved the issue of his housing in 10-block due to his medical condition, *see* grievance #1702 and 1954, and the process which placed him in 10-block, *see* grievance #1954. *See* Exhibits A2 and A3. From October 28, 2003 through January 8, 2004, when the Complaint in this action was filed, plaintiff did not grieve any other issues related to the Complaint in this action. Specifically, the only other grievances plaintiff filed addressed the following issues: his missing property, his failure to see an East Wing Review Board, and a religious order. *See* Grievances ## 1704, 1740 and 1937, attached hereto at Exhibits A4, A5, and A6; *see also*, Affidavit of Ann Marie Aucoin, attached hereto at Exhibit A7.

Although it is true that a plaintiff must address exhaustion in some respect and the failure to do so will justify dismissal, State ex rel Meriwether v. Melindez, 604 N.W.2d 305 (1999); Massey v. Wheeler, 221 F.3d 1030, 1034 (7th Cir. 2000); *see also*,

Underwood v. Wilson, 151 F.3d 292, 296 (5th Cir. 1998), and the complaint must contain "particularized averments" showing that each claim asserted has been exhausted, Knuckles-El v. Toombs, 216 F.3d 640 (6th Cir. 2000), *cert. denied*, 531 U.S. 1040 (2000), plaintiff bears the burden of proving that he has exhausted administrative remedies. Defendants have reviewed their files and have submitted all grievances filed during the relevant time period. Defendants are entitled to a judgment as a matter of law with regard to any claims that plaintiff failed to file a grievance. As such, only the claims delineated by defendants in their Introduction, *supra*, may be pursued in this action.

III. **PLAINTIFF CANNOT MAINTAIN A CLAIM AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES.**

Plaintiff appropriately pleads his claims pursuant to §1983, as his constitutional claims must be assumed to be brought under this statute, or they fail on their face. Title 42 U.S.C. §1983 provides a method for vindicating federal rights elsewhere conferred. It is not itself a source of substantive rights. Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 1870-71, 104 L.Ed.2d 443 (1989). 42 U.S.C. §1983 affords a cause of action for damages or equitable relief against:

> [e]very person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party in injured in an action at law, suit in equity, or other proper proceeding for redress.

The Commonwealth and its agencies, however, are not "persons" within the meaning of 42 U.S.C. §1983. Will v. Michigan Department of State Police, 491 U.S. 58, 109 S.Ct. 2304, 2309 (1989); Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); Woodbridge v. Worcester State

Hospital, 384 Mass. 38, 44-45, n.7 (1981).  In addition, a state official acting his **official capacity** cannot be sued for damages in a section 1983 action.  Wang v. New Hampshire Board of Registration in Medicine, 55 F.3d 698, 700 (1st Cir. 1995).  Therefore, §1983 is not available against the Department of Correction in any forum, and defendants in their official capacities must be dismissed from this case.  It is questionable whether plaintiff has sued defendants in both their official and individual capacities or simply in their official capacities.  Specifically, plaintiff fails to specifically identify in the body of his Complaint, that he is suing defendants in their official and individual capacities.  Rather, he simply states each defendant's name, position within the Department, and business address.  Complaint, at "parties involved."  Accordingly, it should be assumed that plaintiff is simply suing defendants in their official capacities.[3]  Accordingly, defendants cannot be sued in their official capacities for money damages, and therefore, should be dismissed.

IV. **PLAINTIFF HAS FAILED TO STATE ANY CLAIMS AGAINST DEFENDANTS MALONEY, DENNEHY, ALLEN, SILVA AND DOOLIN.**

There are no factual allegations in the complaint against defendants Maloney, Dennehy, Allen, Silva and Doolin.  Their names appears only in the case caption, where the names of the parties are listed in the Complaint, and in one other paragraph in which plaintiff states that he "put Commissioner of Corrections, Michael T. Maloney; Deputy Commissioner of Corrections Kathleen M. Dennehy; Peter Allen, Superintendent of Cedar Junction; Deputy John Luongo, Jr.,; Director of Security; Steven Silva, Unit Team Captain, Edward Doolin, all on notice by way of a speech Freedom of Self-Expression,

---

[3] Plaintiff does state in the case heading that each defendant is being sued in their official and individual capacity; however, where a defendant is simply identified in the case heading, a cause of action against said individual must fail.  *See* Discussion, *infra*, at §IV.  Similarly, where plaintiff simply identifies that each defendant is sued individually in the heading, but fails to actually plead such in the body of the Complaint, the claims against defendants in their individual capacities should be dismissed.

about their correctional officers being incahoots with inmate Joseph L. Druce but was ignored." (Complaint ¶ 10). Where a complaint alleges no specific act or conduct on the part of the defendant and the complaint is silent as to the defendant except for his/her name appearing in the caption, the complaint is properly dismissed, even under the liberal construction to be given *pro se* complaints. Potter v. Clark, 497 F.2d 1206, 1207 (7th Cir. 1974); *See also* Mmoe v. Commonwealth, 393 Mass. 617, 620 (1985)(even *pro se* litigants' pleadings must comply with rules of civil procedure).

Although plaintiff attempts to cure this by simply referring to "defendants" in his Complaint, there are no specific actions attributable to any of these defendants. Moreover, to the extent plaintiff's theory of liability is based on these defendants' supervisory status, the complaint must still be dismissed because supervisory liability may not be predicated upon a theory of *respondeat superior*. Monell v. Dept. of Social Services, 436 U.S. 658, 690-92 (1978); Gurtierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989) (citations omitted).

In the absence of personal involvement, a supervisor is liable for the acts of a subordinate only if (1) the subordinate's behavior results in a constitutional violation **and** (2) the supervisor's action was "affirmatively linked" to the behavior only in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference. Hegarty v. Somerset County, 53 F. 3d 1367, 1379-1380 (1st Cir. 1995). Negligence is inadequate to establish supervisory liability. Febus-Rodriguez v. Betancourt-Lebron, 14 F. 3d 87 (1st Cir. 1994). Plaintiff must show that the supervisor acted with deliberate indifference, in addition to a causation requirement linking the supervisor's conduct to the subordinate's violative conduct. Maldonado-Denis v. Castillo-Rodriguez, 23 F. 3d 576, 582 (1st Cir. 1994);

Febus-Rodriguez, 14 F. 3d at 92 (supervisor's acts or omissions must amount to the reckless or callous indifference to the constitutional rights of others; i.e., that it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights).  The plaintiff alleges no facts linking any of these defendants to the alleged violations.  A simple allegation that plaintiff put these defendants on notice to some sort of conduct by some unidentified correction officer(s) is insufficient to maintain such a claim.  Accordingly, plaintiff's claims against these defendants must fail.

V.       **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

"[G]overnment officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738 (1982).  In determining whether an official is entitled to qualified immunity, the Court should consider whether the unlawfulness of the official's actions is apparent.  Anderson v. Creighton, 107 S.Ct. 3034, 3039 (1987).  Specifically, "qualified immunity sweeps so broadly that all but the plainly incompetent or those who knowingly violate the law are protected from civil rights suits for money damages."  Hegarty v. Somerset County, 53 F.1367, 1373 (1st Cir. 1995)(internal quotations omitted).

The central purpose of affording government officials qualified immunity from suit is to protect them "from undue interference with their duties and from potentially disabling threats of liability."  Elder v. Holloway, 114 S.Ct. 1019 (1994); *citing* Harlow, *supra*, at 806.  Qualified immunity plays a critical role in striking the "balance . . .

between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." Davis v. Sherer, 468 U.S. 183, 195 (1984).

The First Circuit has identified the following two prongs to the basic qualified immunity analysis:

> First, the court must establish whether the constitutional right asserted by the plaintiff was "clearly established" at the time of the alleged violation. Second, the court must ask "whether a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right."

Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st Cir. 1995) *citing* Burns v. Loranger, 907 F.2d 233, 235-236 (1st Cir. 1990). Whether an asserted federal right was "clearly established" at the particular time that the violation purportedly occurred is a question of law not fact. St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995) *citing* Elder, *supra*, at 1023. "For purposes of determining qualified immunity, the officer's actions are measured by a standard of objective legal reasonableness . . . in light of the legal rules that were clearly established at the time [they] were taken." St. Hilaire, *supra*, at 24, *citing* Anderson, *supra*, at 639. Qualified immunity, therefore, does not turn on the government official's state of mind, but rather, on the "objective reasonableness" of the official's action, in light of the legal rules that were "clearly established" at the time the action was taken. Id.

Recognizing that the use of summary judgment in qualified immunity cases could be undermined by a "passably clever plaintiff [who] would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated," the

Supreme Court held that a broad articulation of the "clearly established" law at the time of the alleged violation is inappropriate, stating:

> [T]he right the official is alleged to have violated must have been "clearly established" in the more particularized, and hence more relevant, sense: The contours of the right ust be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

St. Hilaire, *supra*, at 24, *citing* Anderson, *supra*, at 640, n.2.

In the case at hand, although plaintiff has a clearly established right to constitutional due process where a liberty or property interest is implicated, plaintiff has not and cannot identify such a liberty or property interest. In addition, although plaintiff can establish that he has a clearly established right to be free from cruel and unusual punishment, he has not established any factual circumstances that arise to the level of such a violation. More importantly, as to the second prong of this test, plaintiff has not pled and cannot demonstrate that a reasonable official in defendants' circumstances would have known that a clearly established right was being violated in either his housing in 10-block or his medical care. First, plaintiff has not alleged that a liberty or property interest has been violated, thereby implicating due process protections. Moreover, plaintiff has not and cannot allege any violations of law which defendants knew or should have known violated a clearly established constitutional right. Rather, plaintiff simply alleges that his housing in 10-block bothered his medical condition and that it was not fair that he was housing in 10-block with other inmates who were allegedly extremely violent.[4]

---

[4] It is important to note that plaintiff conveniently omitted any actions that he may have done to cause his placement in 10-block. Rather, he avoids the subject matter of what actions he did or was alleged to have done to cause his placement in 10-block at any point in time.

Accordingly, on the face of plaintiff's Complaint, plaintiff has not demonstrated that a reasonable official in defendants' circumstances would have known that a clearly established right was being violated.

VI. **PLAINTIFF HAS RECEIVED ALL THE PROCESS HE WAS DUE, THUS HIS DUE PROCESS CLAIMS FAIL AS A MATTER OF LAW.**

    A.    **The Due Process Clause Itself.**

In the context of a prison inmate, a state is prohibited, by the Fourteenth Amendment, from depriving a person of life, liberty or property without due process of law. Meachum v. Fano, 427 U.S. 215, 233 (1976). The test for determining a due process violation is first whether plaintiff has been deprived of a liberty interest within the meaning of the due process clause and if so, was that deprivation accomplished without due process of law. Id. A liberty interest, protected by the due process clause, may arise from one of two sources, (1) the due process clause itself, and/or (2) state law. Hewitt v. Helms, 459 U.S. 460, 466 (1983).

Due process and the interests it protects "'are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" Parratt v. Taylor, 451 U.S. 527, 529 n.1 (1981)(*quoting* Board of Regents v. Roth, 408 U.S. 564, 577 (1972). The Due Process Clause does not, in and of itself, restrict a prison official's discretionary authority when managing their respective institutions. The administration of a prison is "at best an extraordinary difficult undertaking," and broad discretionary authority is necessary. Id. at 467; quoting, Wolff v. McDonnell, 418 U.S. 539, 566 (1974). The Supreme Court has cautioned against

subjecting what has traditionally been the discretionary business and actions of prison administrators to the wide spectrum of judicial review. Meachum, at 225. Additionally, it has long been held that the lawfully incarcerated retain only a narrow range of protected liberty interests. Hewitt, at 467. The Supreme Court has also consistently refused to recognize more than the most basic liberty interests for inmates.

### B.      State Created Liberty Interest.

In Sandin v. Conner, 115 S. Ct. 2293 (1995), the Court criticized its former precedent under which courts examined the language in state statutes and regulations to determine whether a liberty interest was created. This doctrine "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." Id. at 2299. The Court expressed two policy concerns: its prior approach "creates disincentives for States to codify prison management procedures in the interest of uniform treatment." Id. The old approach also "has led to the involvement of federal courts in the day-to-day management of prisons," contrary to cases affording state officials appropriate deference and flexibility in prison management. Id.

The Court held that states may still create liberty interests that afford prisoners due process protections, but strictly limited these areas by explaining that:

> [T]hese interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Id. at 2300 (internal citations omitted)(emphasis added). Applying this standard to the prisoner in Sandin, the Court concluded that disciplining a prisoner for thirty days in segregated confinement "did not present the type of atypical, significant deprivation in

which a state might conceivably create a liberty interest." Id. at 2301. In the case at bar plaintiff alleges that the defendants violated his due process rights by his classification and by allegedly denying him participation in the CRA program, thus denying him this opportunity to earn good time. Applying Sandin, plaintiff has not stated a cause of action on his claims that his Fourteenth Amendment due process rights were violated, because he can not establish that he had a liberty interest in his housing in the Special Management Unit ("SMU"), 10-Block, at MCI-Cedar Junction.

      C.     **Plaintiff has no Right to Housing of his Choice.**

Correction officials have absolute discretion regarding the placement of prisoners within the correctional system. The classification of prisoners to institutions of different levels of security neither implicates any protected liberty interest nor triggers any due process protection under the state and federal constitutions. Meachum v. Fano, 427 U.S. 215 (1976) (rejecting the notion that reclassification and transfer of a Massachusetts inmate to higher custody infringes on a liberty interest of the due process clause.); Dominique v. Weld, 73 F.3d 1156 (1st Cir. 1996). The decision of where to place prisoners within the correctional system is simply a matter of administrative discretion invoked for varied reasons such as security, convenience or rehabilitation. Meachum v. Fano, 427 U.S. at 228; Jackson v. Commissioner of Correction, 388 Mass. 700, 703 (1983).

Plaintiff's housing assignment was appropriately determined by the judgment and experience of Department officials, as courts recognize that deference is due prison administrators in their attempts to secure the safety of prison staff, and to preserve discipline in the prisons. Sires v. Berman, 834 F.2d at 14, *citing* Bell v. Wolfish, 441

U.S. 520, 547-48 (1979).  Prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.  <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979).  They also have broad administrative and discretionary authority for the running of the correctional facility, and inmates retain only a narrow range of protected liberty interests.  <u>Hewitt v. Helms</u>, 459 U.S. 460, 467 (1983) (reversed on other grounds).  Accordingly, plaintiff has no due process right with regard to his classification and housing.  Moreover, during all times relative to plaintiff's Complaint, he had received proper classification hearings pursuant to 103 CMR 420.00, *et seq*.  *See* Classification Boards, attached hereto at Exhibits B1 and B2.

       D.      **Plaintiff Has Failed to Demonstrate that He Has a Liberty or Property Interest in the Subject Short Segregation Placement with Regard to any Placements on Awaiting Action Status.**

Liberty interests protected by the Fourteenth Amendment "may arise from two sources -- the Due Process Clause itself and the laws of the States."  <u>Hewitt v. Helms</u>, 459 U.S. 460, 466, 103 S.Ct. 864, 868-869, 74 L.Ed.2d 675 (1983).  As identified, *supra*, the framework for determining whether a prisoner challenging prison practices has stated a liberty interest is set forth in <u>Sandin</u>, *supra*, at 2293.  In the prison context, very few deprivations give rise to direct protection by the Due Process Clause of its own force.  In <u>Sandin</u>, the Supreme Court references just two instances:  first, the involuntary transfer of a prisoner to a psychiatric hospital, and second, the involuntary administration to a prisoner of antipsychotic medication.  <u>Sandin</u>, *supra*, at 2300, citing <u>Vitek v. Jones</u>, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)(involuntary hospitalization), and <u>Washington v. Harper</u>, 494 U.S. 210, 221-222, 110 S.Ct. 1028, 1036-1037, 108 S.Ct. L.Ed.2d 178 (1990)(involuntary medication).  In order to implicate a protected liberty

interest under the confines of Sandin, plaintiff must demonstrate that his alleged treatment with regard to the awaiting action segregation issues involved in plaintiff's Complaint "imposes atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." Id.

Plaintiff cannot demonstrate that the limited awaiting action time "imposes atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." Specifically, plaintiff claims that lack of a TV and radio for a short, unidentified period of time, amounts to an atypical and significant hardship. Any such claim is ludicrous. Plaintiff has absolutely no right to a TV and/or radio, and must assume such restrictions when being incarcerated. Moreover, the lack of a TV and/or radio does not even come close to rising to the level of a liberty interest as contemplated by the Court in Sandin, *supra*.[5] Moreover, plaintiff challenges his housing for short periods of time in 10-block; however, he fails to identify those periods of time. Rather, plaintiff identifies other allegedly violent inmates who have allegedly been housed in 10-block for two to three months, leading one to assume plaintiff was housed in 10-block for a longer period of time. First, assumptions such as this cannot be made, as plaintiff is required by the Federal Rules to plead facts necessary to support his claims. *See* Rule 8. More important, however, is the fact that plaintiff only spent minimal time periods, as dictated by his behavior, his safety and security, and the safety and security of the institution, in 10-block. Specifically, plaintiff was transferred to 10-block on November 4, 2005, after the Superintendent received a letter from the Norfolk County District Attorney's office

---

[5] Moreover, it is extremely important to note that plaintiff complains of not having a television and/or radio while housed in 10-Block; however, for the majority of this time, plaintiff was serving a disciplinary sentence of a loss of TV and radio due to a serious disciplinary infraction to which he pled guilty. *See* Disciplinary Report, attached hereto at Exhibit D1.

which contained a copy of a letter written to them by plaintiff stating that he had enemy issues with "Aryan Supremacists and Latin King gang members" at MCI-Cedar Junction, where he was presently incarcerated.  *See* Complaint, at ¶1; Bed Management Sheet, attached hereto at Exhibit C; and Classification Board, attached hereto at Exhibit B2.  Because of the alleged threat to his safety, plaintiff was placed on Awaiting Action status in the SMU, pending an investigation of the allegations and if necessary, re-classification if the allegations were sustained.  Pursuant to 103 CMR 423.08(1)(d), an inmate may be placed in a special management unit when staff determines that there may be a risk to his safety and no other reasonable alternative exists.  In this case, the allegation that there were potentially numerous unidentified inmates housed at MCI-Cedar Junction was deemed to pose a substantial threat to plaintiff until the allegations could be investigated and any enemies specifically identified.  Moreover, plaintiff had been charged with a serious disciplinary offense on October 28, 2003, and could have been placed in the SMU pending a hearing and disposition on these offenses pursuant to 103 CMR 423.08(1)(a).  *See* Disciplinary Report, attached hereto at Exhibit D1.  Furthermore, if a serious enemy issue were found to exist, plaintiff would then be housed in the SMU pending re-classification to another facility.  103 CMR 423.08(1)(f).

Once the potential security issues had been resolved, plaintiff was removed from the SMU and returned to an East Wing Restrictive Unit in general population on January 8, 2004, awaiting an East Wing Hearing pursuant to 103 CMR 421.00.  *See* Bed Management Sheet, attached hereto at Exhibit C.  However, prior to said hearing being conducted, plaintiff was in a fight with two other inmates and was immediately returned to the SMU pending the disposition of the disciplinary proceeding.  *See* 103 CMR

423.08(1)(a); and Disciplinary Report, attached hereto at Exhibit D2.  On February 2, 2004, plaintiff was then returned to an East Wing Restrictive Unit in general population.  See Bed Management Sheet, attached hereto at Exhibit C.  Three days later, plaintiff had an East Wing Hearing pursuant to 103 CMR 421.00, where it was recommended that he be housed in the restrictive units, as he posed a substantial threat to the safety and operation of the institution based upon his two serious disciplinary reports previously mentioned.  See East Wing Hearing Report, attached hereto at Exhibit E.  Plaintiff remained in the East Wing Restrictive Unit in general population until June 2, 2004, when he was returned to the SMU for two (2) days on awaiting action status due to a fight occurring on the evening of June 1, 2004.  *See* Disciplinary Report, attached hereto at Exhibit D3.  Plaintiff was removed from the SMU and returned to his East Wing Restrictive Unit two days later, on June 4, 2004.  *See* Bed Management Sheet, attached hereto at Exhibit C.  Plaintiff has not returned to the SMU.  Id.

Thus, even taking every allegation contained in plaintiff's Complaint as true, as a matter of law, plaintiff's due process claims fail, as no liberty interest has been implicated in his housing in the SMU at Cedar Junction.  Moreover, plaintiff's placement in the SMU on every occasion was consistent with Department regulations.

### VII. PLAINTIFF HAS FAILED TO SET FORTH FACTS SUFFICIENT TO SUSTAIN A CLAIM FOR RETALIATION.

While correctional officials may not discipline inmates for an improper purpose, Sires v. Berman, 834 F.2d 9, 13-14 (1st Cir. 1987); Gomes v. Fair, 738 F.2d 517, 525 (1st Cir. 1984), the courts impose stringent standards for prisoners' claims of retaliation for the exercise of grievances or litigation.  First, courts recognize that "deference is due prison administrators in their attempts to secure the safety of prison staff, and to preserve

discipline in the prisons." <u>Sires v. Berman</u>, 834 F.2d at 14, *citing* <u>Bell v. Wolfish</u>, 441 U.S. 520, 547-48, 99 S.Ct. 1861, 1878-79, 60 L.Ed.2d 447 (1979).  Accordingly, in order to set forth a claim of retaliation, a prisoner must be able to demonstrate that the alleged improper decision would not have been made "but for" the impermissible purpose of retaliation.  <u>Layne v. Vinzant</u>, 657 F.2d 468, 475 (1st Cir. 1981); <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979); <u>Association for Reduction of Violence v. Hall</u>, 558 F.Supp. 661, 662-663 (D.Mass. 1983).  Conversely, a prisoner cannot sustain a claim of allegedly impermissible conduct where the actions of the prison officials were also supported by a permissible purpose.  In <u>Scarpa v. Ponte</u>, 638 F.Supp. 1019, 1029 (D.Mass. 1986), the Court held that even if the defendants had an impermissible reason for disciplining the prisoner, they would still not be liable if they also had independent, permissible reasons for doing so.

Second, courts recognize that a retaliation charge carries a substantial potential for abuse.  Without close judicial scrutiny, any prisoner who has ever grieved a complaint or filed a lawsuit would be able to cry retaliation whenever correctional officials took any action not to his liking:

> [W]e believe that *in forma pauperis* plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked allegations of reprisal to survive [28 U.S.C.] § 1915(d).  To hold otherwise would be to bring virtually every unpopular decision by state actors within the scope of a cause of action for retaliation.  This would pose particular problems in the context of prison administration.  Every act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct.  The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.

<u>Adams v. Rice</u>, 40 F.3d 72, 74 (4th Cir. 1994), *cert. denied* 514 U.S. 1022 (1995).  In order to separate the wheat from the chaff,

> [a] claim of retaliation must include a "chronology of events from which retaliation may plausibly be inferred."  Furthermore, an inmate claiming retaliation for the exercise of first amendment rights must show more than subsequent adverse administrative action, Rather, the prison official's conduct must transcend all bounds of reasonable conduct and shock the conscience.  The plaintiff makes no such allegations.  Indeed, he admits that he bases his retaliation claim on the mere fact that his lawsuit was filed before the events in the complaint.  A plaintiff cannot bootstrap a frivolous complaint with a conclusory and speculative allegation of retaliation.

Stamps v. McWherter, 888 F.Supp. 71, 74 (W.D.Tenn. 1995) (internal citations omitted).

In order for plaintiff's retaliation claim to stand, he must demonstrate that "but for the retaliatory motive, the incidents to which he refers . . . would not have taken place." Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998), *citing* Smith v. Maschner, 899 F.2d 940, 949-950 (10th Cir. 1990).  In Peterson, plaintiff was an "ambitious jailhouse lawyer," representing a number of inmates in various capacities.  Plaintiff was placed in segregation for "allegedly attempting to escape from prison," one day after a court hearing.  Peterson, *supra*, at 1142.  Plaintiff further alleged that the prison warden addressed him in his segregation cell, stating "'[y]ou tricky little bastard, I've got you now.  I'm going to [expletive] you for each and every suit you have done against me and the prison.'"  Id.  Plaintiff then stated that he was transferred to another institution and his word processor taken away so that he was unable to complete legal work, all in retaliation for his bringing suit and assisting other inmates in bringing suit against the warden and the Department.  Id., at 1142-1143.  In dismissing plaintiff's claims, the tenth circuit held that plaintiff presented "no evidence that the defendants' alleged retaliatory motives were the 'but for' cause of the defendants' actions" in his Complaint.  Peterson, *supra*, at 1144.  Where there was another basis for defendants' actions, plaintiff could not sustain the stringent "but for" standard in demonstrating retaliation.